Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 52 | **DATE** | 2/24/2003 |
| **CASE TITLE** | colspan | USA vs. Jamaine Jackson | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons set forth on the attached Memorandum Opinion and Order, the Court rules that defendant's offense level will be determined by application of Guidelines §2J1.5.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 26 2003 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR6 | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 02 CR 52 |
| | ) | |
| JAMAINE JACKSON | ) | |

**MEMORANDUM OPINION AND ORDER**

DOCKETED FEB 2 6 2003

MATTHEW F. KENNELLY, District Judge:

Defendant Jamaine Jackson was indicted for criminal contempt and obstruction of justice in connection with his refusal to testify in the case of *United States v. Hankton,* 99 CR 272, pending before Judge Blanche Manning. Jackson pled guilty to the criminal contempt charge and is awaiting sentencing. Jackson has objected to the Sentencing Guideline calculation proposed by the Probation Office in the presentence report. For the reasons set forth below, Jackson's objection to the proposed Guideline calculation is sustained.

**Background**

Just after midnight on April 13, 1994, Jackson and others beat Annette Williams to death outside of her apartment in a Chicago housing project. Williams, like Jackson, was a member of the Mickey Cobras street gang; the beating was ordered by the gang's leaders on the grounds that Williams had supposedly stolen $3,000 from Clarence Hankton, a high-ranking member of the gang. After Jackson was picked up by the police for unrelated reasons, he was recognized as one of the suspects in the beating. Following questioning, Jackson admitted his involvement in the murder, telling the police that Clarence Hankton had told him and Lindsey Bell, another gang member, that Williams was to be beaten on orders of Charles Smith, the gang's leader, due to the

alleged theft. Jackson, Bell, and Carl Williams, another gang member, were charged with murder in state court. Bell pled guilty and was sentenced to 40 years in prison. Jackson and Williams were tried and convicted; each was sentenced to 60 years. Jackson began serving his sentence at Stateville Correctional Center.

In April 1999, a federal grand jury investigating Hankton and the Mickey Cobras subpoenaed Jackson, Bell, and Williams, and they were transferred to the Chicago Metropolitan Correctional Center on writs of habeas corpus *ad testificandum*. All three were given use immunity. Jackson and Bell testified before the grand jury regarding the murder of Williams in a manner consistent with their earlier statements to the Chicago police. Based on their testimony, the grand jury indicted Hankton, charging him with violent acts in aid of racketeering in violation of 18 U.S.C. §1959. The indictment was placed under seal.

Jackson remained in the Chicago MCC, in segregation, from April 1999 through June 2000. Jackson argues, without contradiction by the government, that the effect of this was to brand him as a snitch. While Jackson remained housed at the MCC, the federal prosecutor in charge of the Hankton investigation negotiated with the Illinois Department of Corrections and the United States Bureau of Prisons to arrange for Jackson to serve the remainder of his state sentence in federal custody. These efforts proved unsuccessful, and in June 2000 Jackson was returned to state custody over the federal prosecutor's objection. After a brief period at the Joliet Correctional Center, Jackson was returned to Stateville Correctional Center, where he was placed in the general prison population. According to Jackson, his attorney complained to the federal prosecutor that this put him at risk of retaliation for his testimony concerning Hankton. Though the government does not dispute that Jackson's attorney expressed such concerns, it disputes his

claim that this reflected an attitude of indifference: the federal prosecutor advised Jackson's attorney that Hankton's indictment was still sealed and suggested that were Jackson placed in segregation (protective custody) at Stateville, it would be a clear sign that he was cooperating with the authorities. It seems that the federal prosecutor was correct; Jackson says that he was approached by a gang member at Stateville who questioned him, and that his denial of cooperation "seem[ed] to satisfy" the gang member at the time. *See* Jackson Aug. 2001 Affid. ¶4.

Jackson's mother says that in late November 2000, she was visited by several gang members who told her that "someone was snitching on the Cobras" and that "they were going to get it." Jackson's mother denied any knowledge of what they were talking about. *See* Williams Aug. 2001 Affid. ¶3. She reports that she later learned that gang members had visited her neighbor and indicated that they would find out whoever was "tricking on the Cobras," and that she herself was visited on unspecified dates in 2001 by groups of gang members. *Id.* ¶¶4-5.

When Hankton's indictment was unsealed upon his arrest in January 2001, the federal prosecutor advised the Illinois Department of Corrections, and Jackson was placed in segregation for his own safety. Later that month, Jackson says, he was approached by another person whom he knew to be associated with high ranking members of the gang. This person told Jackson that gang members had advised him that they heard Jackson was cooperating with the authorities. Jackson denied this, but the other individual advised him that his cooperation had been reported in the media. *See* Jackson Aug. 2001 Affid. ¶¶5-6.

Jackson returned to the Chicago MCC in early August 2001 after service of a writ of habeas corpus *ad testificandum,* in anticipation of Hankton's trial. Following the transfer,

3

Jackson's attorney wrote to the federal prosecutor, advising her that Jackson would not meet with her and would not testify without a guarantee that he and his family would be admitted into the federal Witness Security Program. The federal prosecutor provided Jackson, through his lawyer, with information regarding that program, and she and Jackson's lawyer had a series of discussions regarding his possible entry into the program. The prosecutor advised Jackson's lawyer that the Department of Justice would process Jackson's application to the program based on his earlier cooperation, but that there were some admission requirements that required Jackson's involvement, including taking a polygraph examination. She also advised that Jackson would not be allowed to remain in the Witness Security Program if he refused to testify at Hankton's trial.

Jackson and Bell were immunized in anticipation of their testimony at Hankton's trial. Jackson continued to express concerns for his own safety and that of his family, and he declined to testify without a written guarantee of acceptance into the Witness Security Program, a guarantee that the government was not prepared to provide (for the reasons stated above, according to the prosecutor). The government advised Judge Manning that its case against Hankton depended on the testimony of Jackson and Bell; it obtained authority from Judge Manning to take their depositions, and Judge Manning ordered both men to appear and testify. Hankton was present for both depositions, which were taken separately on August 21, 2001. During his deposition, Bell sat silently as questions were posed. When Jackson's deposition was taken, he responded to preliminary questions but refused to answer any substantive questions. Judge Manning held both men in civil contempt.

Judge Manning lifted the civil contempt order against Jackson on November 16, 2001

4

after finding that he would continue to refuse to testify regardless of the length of the term of contempt. The civil contempt order against Bell was lifted in January 2002. Jackson and Bell were indicted separately for criminal contempt and obstruction of justice that same month. Bell pled guilty to both charges. As indicated earlier, Jackson pled guilty only to the criminal contempt charge; his plea agreement provides that the obstruction charge will be dismissed at sentencing.

## Discussion

Sentencing Guideline §2J1.1, which governs criminal contempt charges, directs the application of Guideline §2X5.1, which in turn directs the Court to apply "the most analogous offense guideline." The Probation Office recommended in the presentence report that the Court apply Guideline §2J1.2, which concerns obstruction of justice. Jackson objects, arguing that the most analogous Guideline is §2J1.5, which concerns failure to appear by a material witness. The government agrees with the Probation Office's recommendation; it argues that Jackson obstructed justice in the prosecution of Hankton. And it takes this one step further, arguing that under Guideline §2J1.2(c), because "the offense involved obstructing the investigation or prosecution of a criminal offense," the Court should apply that subsection's cross-reference to Guideline §2X3.1, which concerns accessories after the fact, and calculate Jackson's offense level based on the underlying charge against Hankton, namely murder.

The Court's determination of this issue is governed by the Seventh Circuit's decision in *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996). In that case, Julio Ortiz and Manuel Hurtado were charged with conspiracy to distribute heroin. Hurtado was arrested first and pled guilty; later, after Ortiz was arrested, Hurtado was immunized and ordered to testify at Ortiz's trial.

5

Hurtado gave brief testimony confirming his own involvement but refused to testify about Ortiz; the jury nonetheless convicted Ortiz. The government then charged Hurtado with criminal contempt, and he pled guilty. At sentencing the trial judge, over Hurtado's objection, applied Guideline §2J1.2 as well as the cross-reference in §2J1.2(c) and imposed a sentence derived from the Guidelines applicable to narcotics conspiracy pursuant to the §2X3.1 "accessory after the fact" provision.

The Seventh Circuit reversed Hurtado's sentence, holding that the trial court should have applied the "failure to appear" Guideline, §2J1.5. It first noted that Hurtado's refusal to testify did not qualify him as an "accessory after the fact" of Ortiz:

> Title 18, U.S.C. § 3, provides that "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." Hurtado neither received, relieved, comforted, nor assisted Julio Ortiz. Having been arrested himself, it was impossible for Hurtado to "receive" Ortiz. His post-arrest statements to the police . . . cannot be said to have provided Ortiz with relief, comfort, or assistance. Actually, the assistance Hurtado provided was entirely to the government, not Ortiz.

*Ortiz*, 84 F.3d at 980. The court went on to conclude that application of the obstruction of justice Guideline, §2J1.2, was inappropriate, as there were "no overt acts in the record which indicate that Hurtado intended to obstruct justice, beyond his refusal to testify." *Id.* In this regard, the court found the case similar to *United States v. Herre*, 731 F. Supp. 1051 (S.D. Fla. 1990), which it quoted with approval for the proposition that "[i]f the Government believes that the obstruction of justice guideline applies, then it must, at a minimum, point to specific acts by the Defendant resulting in the obstruction of justice, or otherwise show that the Defendant's conduct was designed to interfere with the administration of justice." *Ortiz*, 84 F.3d at 981 (quoting *Herre*,

731 F. Supp. at 1053). In *Herre,* the defendant's simple refusal to testify was insufficient to satisfy the government's burden; the Seventh Circuit agreed with this in *Ortiz,* finding Hurtado's refusal to testify likewise insufficient, stating that "[a]ll in all, there is nothing to truly indicate that Hurtado's refusal to testify was designed to assist Ortiz in escaping punishment. On the contrary, without Hurtado's statements on the day of his arrest, the government would not have been able to charge Ortiz." *Id.* The same is true here. Jackson gave the government the information it evidently needed to prosecute Hankton, and there is nothing beyond his simple refusal to testify against Hankton at trial indicating that his actions were "designed to interfere with the administration of justice" or were "designed to assist [Hankton] in escaping punishment."

To be sure, Jackson's case is not identical to *Ortiz.* The Seventh Circuit noted that at Ortiz's trial, before declining to answer questions, Hurtado admitted his own involvement and identified the undercover agent to whom he had sold the heroin, "thus bolstering the agent's testimony," and also indicated that he knew Ortiz. For this reason, the court indicated that although Hurtado "did not, at the trial, help convict Ortiz, . . . he certainly didn't try to help get him acquitted either." *Id.* The same is not true here; Jackson gave no substantive testimony at all. But the distinction is immaterial. The Seventh Circuit's focus in *Ortiz,* and thus our focus here, is on the defendant's purpose – his "design," as the court put it in *Ortiz*. The government glosses over this point, focusing its attention entirely on the *effects* of Jackson's refusal to testify. That cannot be the sole focus: knowledge of a likely result is not always the same as a design to bring about that result. To put it another way, not all refusals to testify by material witnesses constitute obstruction of justice – as would be the case if a recalcitrant witness's knowledge of

7

the likely effect of his refusal were by itself sufficient to demonstrate that his purpose was to cause that effect. Were the contrary true, *Ortiz* would be a dead letter.[1]

The government also notes that in sentencing Bell, our respected colleague Judge William T. Hart applied Guideline §2J1.2 as well as the cross-reference in §2J1.2(c). *United States v. Bell*, No. 02 CR 51, 2002 WL 31804211 (N.D. Ill. Dec. 12, 2002). But there is a significant difference between this case and Bell's. Jackson pled guilty only to contempt; Bell pled guilty to obstruction of justice as well as contempt. This made it impossible for Bell to argue that the government had failed to prove that he acted with the intent to obstruct justice; as Judge Hart found, Bell had admitted exactly that in pleading guilty to the obstruction charge. *Id.* at *3 (concluding that Bell had "admitted the . . . allegations of obstruction of justice and therefore cannot deny an intent to obstruct."). Jackson has made no such admission; rather, he has consistently maintained that his refusal to testify was motivated by fear for his and his family's safety. Thus *Bell* does not govern this case.

We turn, then, to the evidence regarding Jackson's purpose in declining to testify at Hankton's trial. The government offers no evidence (other than Jackson's likely knowledge of the effects of his actions) indicating that Jackson's purpose or goal was to allow Hankton to avoid prosecution. In the presentence report, the Probation Officer notes that the investigating

---

[1] The Court likewise rejects the government's argument that *Ortiz* is distinguishable because "Jackson knew that his refusal to testify would mean that Hankton would not be tried, let alone convicted." Govt. Mem. at 13-14. Jackson presumably knew that his refusal to testify would hurt the government's case, but the government has offered no evidence to show that he knew that it would sound the death-knell to the prosecution's case. Among other things, if Bell had testified, Jackson's refusal likely would not have affected the outcome; and the government has offered no evidence that Jackson and Bell had communicated or that they acted in cahoots in refusing to testify.

8

agent advised her that at Jackson's abortive deposition in the Hankton case, when he left the room Jackson "turned and smiled at Hankton as a sign of gang loyalty." Presentence Report at 3. Though we do not question the accuracy of the agent's observation of Jackson's smile, the conclusion that it was a "sign of gang loyalty" is nothing more than a surmise on the agent's part. It is just as likely that it was indicative of an effort by Jackson to stay off of Hankton's enemies list – in other words, that it reflected nothing more than the same fears that Jackson says motivated him not to testify.

The government argues that Jackson's initial willingness to testify in the grand jury implies that his later refusal could not have been for the purpose of ensuring his and his family's safety – if that were the case, the government argues, Jackson never would have testified before the grand jury to begin with. This, however, is a *non sequitur*. Jackson presumably knew that his grand jury testimony was given in secret, and he may not have contemplated what ultimately would happen if his cooperation was made public. Jackson has shown without contradiction that once it was made public, he and his family were the recipients of repeated express and implied threats. In other words, the situation had changed materially when it came time for Jackson to testify at trial; thus no reasonable inference can be drawn from the fact that he acted differently at that point than he had when his cooperation was still secret.

For the foregoing reasons, the government has failed to carry its burden of proving that Jackson's refusal to testify was motivated by a purpose to obstruct justice. Rather, the evidence shows that he acted as he did for the purpose of protecting himself and his family from retaliation by the gang. Though there is no doubt that Jackson should have realized that his actions could have an effect on the prosecution of Hankton, his awareness of that consequence is insufficient,

without more, to satisfy the government's burden. The Court therefore rejects the government's argument that Guideline §2J1.2 should govern Jackson's sentence. *See United States v. Brady,* 168 F.3d 574, 580 (1st Cir. 1999) (applying §2J1.2 in a contempt case involving refusal to testify, but indicating that if the defendant's refusal had been motivated by a fear of retaliation, application of §2J1.2 likely would be inappropriate; citing *United States v. Underwood,* 880 F.2d 612, 620 (1st Cir. 1989) (Breyer, J.)). The applicable Guideline, as argued by Jackson, is §2J1.5.

The government suggests one other basis for application of the more severe §2J1.2. It expresses the view that application of §2J1.2 as well as §2J1.2(c)'s cross-reference to the offense of murder "appropriately reflects Jackson's conduct and is in keeping with the sentence received by Bell . . . ." Govt. Mem. at 9. Bell received an effective sentence of 26 months (Judge Hart sentenced him to 96 months but ruled that the first 70 months would be served concurrently with his state sentence). The Court rejects this argument. Just as equity among co-offenders is not a proper basis for lowering a particular defendant's sentence, *see United States v. McMutuary,* 217 F.3d 477, 489-90 (7th Cir. 2000) (disparity with the sentence of a co-defendant is not an appropriate basis for a downward departure), the similarity of Bell's and Johnson's conduct is not a proper basis for determining what Sentencing Guideline applies to Jackson's case (and in any event, as noted earlier, Bell, unlike Jackson, pled guilty to a charge of obstruction of justice). Similarly, dissatisfaction with the sentencing range that might result is not a proper consideration in determining the appropriate Guideline, just as it is not an appropriate basis for a departure. *See United States v. Cruz-Guevara,* 209 F.3d 644, 648 (7th Cir. 2000) (dissatisfaction with sentencing range is not an appropriate basis for departure).

## Conclusion

For the reasons stated above, the Court rules that defendant's offense level will be determined by application of Guideline §2J1.5.

```
                                        _____
                                        MATTHEW F. KENNELLY
                                        United States District Judge
```

Date: February 24, 2003